DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

FRANK J. RIEBLI (CABN 221152)
ERIN A. CORNELL (CABN 227135)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Frank.Riebli@usdoj.gov
    Erin.Cornell@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 19-043 YGR |
| Plaintiff, | |
| v. | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY |
| DESHAWN LEMONS-WOODARD, | |
| Defendant. | Date: May 1, 2020<br>Time: 10:30 a.m. |

## I. INTRODUCTION

Deshawn LEMONS-Woodard asks for temporary release from custody because he has asthma and might contract COVID-19 while in custody. LEMONS describes his request as a matter of life or death: either the Court releases him, or he will die in jail. The Court faces no such choice. LEMONS' use of such dire language is an effort to distract the Court from the facts that he has no proposed co-signor, he has demonstrated repeatedly, and in this case, that he cannot be supervised and will continue to commit crimes if released. There is no reason to believe he would behave differently if the Court releases him again. The fact of the COVID-19 pandemic does not make LEMONS more amenable to supervision than he was before. The Court cannot guaranty that LEMONS will not contract COVID-19, whether he is in or out of custody. And tt is impossible to predict the relative risks of contracting COVID-19 in or out of custody with a defendant who has proven that he does not follow instructions, even as they pertain to the very asthma condition he relies on here. What is certain however, is that if LEMONS contracts COVID-19 while in custody, he will receive adequate treatment. He does not contend otherwise. The government asks that the Court deny his motion.

## II. PROCEDURAL BACKGROUND

A federal grand jury charged LEMONS with trafficking firearms without a license, in violation of 18 U.S.C. § 922(a)(1)(A), and with conspiring with others to do so, in violation of 18 U.S.C. § 371. He faces up to five years in prison if convicted.

LEMONS appeared before the Court for a bail hearing April 10, 2019. Pre-Trial Services recommended that the Court detain him as a danger to the community because it appeared that he was not amenable to community supervision. The Court gave LEMONS an opportunity to prove Pre-Trial wrong and released him on a $75,000 bond, with his mother and aunt as co-signors, and his aunt acting as custodian. The Court imposed other conditions as well, including that LEMONS remain at home on house arrest (except for limited purposes), that he not access the internet, and that he not have contact with his co-defendants outside the presence of counsel. As the Court will recall, and as LEMONS admits, he willfully violated these conditions: he used his time out of the house for work to distribute drugs, he continued to use drugs and evade Pre-Trial's testing program, and he had communications

with his co-defendants.  In October, the government provided evidence of those violations to the Court and moved to revoke his bond.  On November 4, 2019, the Court remanded him to custody and, after considering further briefing, imposed a $75,000 forfeiture order against LEMONS and his mother (who was a co-signor).

LEMONS filed his present motion on April 22, 2020.  See Dkt #227.  He seeks release on his own recognizance, with no co-signors, for an indefinite period.

### III.  DISCUSSION

#### A.  Legal Standard

LEMONS seeks temporary release, based on the possibility that he might contract COVID-19 while in custody, and to facilitate meetings with his attorney to prepare his defense.  The Court may "permit the temporary release" of a defendant if release is "necessary for preparation of the person's defense or for another compelling reason."  18 U.S.C. § 3142(i).[1]  The government bears the ultimate burden of persuasion to detain pretrial.  Hir, 517 F.3d at 1087.  However, once a defendant is ordered detained, it is the defendant who must show that temporary release is necessary under Section 3142(i).  United States v. Dupree, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).  LEMONS contends that his medical condition and his need to prepare a defense constitute "compelling reasons" for release in light of the COVID-19 pandemic.  Both arguments fail.

#### B.  LEMONS Does Not Actually Seek Temporary Release.

LEMONS is ineligible for temporary release under § 3142(i) because he does not seek temporary release.  He offers that his release would only last "until the risk of death subsides and the authorities come to terms with the virus and effectuate a workable plan to make the jail safe for pretrial detainees."  Mot. at 7.  This standard is so vague it's meaningless.  On the one hand, LEMONS would never have to concede it had been met.  On the other, the government can argue that it already has.

---

[1] LEMONS does not cite § 3142(i).  Instead, he relies on 18 U.S.C. § 3142(c)(3), which permits the Court to modify the terms of a defendant's release.  Mot. at 7.  Since LEMONS is not currently released on a bond, it appears that § 3142(c)(3) does not apply.  Though in one place he asks the court to "set aside" the order revoking his bond, he also asks for temporary release.  Mot. at 1.  Thus, it does not appear that he is seeking to re-open his bail hearing, but instead seeking release under the narrower ground provided in § 3142(i).

### C. LEMONS' Asthma Does Not Constitute a "Compelling Reason" for Release.

Even if LEMONS were seeking temporary release, it would not be appropriate here. Though LEMONS might have a pre-existing health condition that places him at higher risk of serious illness, that health condition does not warrant release in this case. "[I]t is a rare case in which health conditions present an 'exceptional reason'" to allow for release where detention would otherwise be warranted. See, e.g., United States v. Wages, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting cases). According to the Centers for Disease Control and Prevention, those with "moderate to severe asthma may be at higher risk of getting very sick from COVID-19." See https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/asthma.html (last visited Apr. 23, 2020). The CDC does not say that those with moderate to severe asthma face a "high risk of dying," as LEMONS asserts. Mot. at 4. Especially now, it is important to distinguish hyperbole from credible public health information. And credible public health information is that moderate to severe asthma may put a person at higher risk of getting very sick. It does not put that person at high risk of dying. To the contrary, as LEMONS admits, most people who contract COVID-19 recover. Mot. at 4.[2]

Moreover, LEMONS does not contend that he has moderate to severe asthma.[3] The government has requested copies of medical records that might address the severity of LEMONS' condition, but so far has received nothing. Thus, it is not even clear that he is in a high-risk population.

Courts around the country have denied release where the basis was asthma, especially where it was just an assertion of asthma with nothing more. See United States v. Rodriguez, 2020 WL 1866040 at *4 (S.D.N.Y. April 14, 2020) (post-conviction case involving asthma: "All he has done is note that he has asthma, he is in prison, and there is a COVID-19 outbreak nationwide. That is not enough."); United States v. Suggs, 2020 WL 1867097 (W.D. Pa. April 14, 2020) (pre-trial case where the defendant had asthma and diabetes: "While the court is sympathetic to Suggs's medical concerns and claims

---

[2] LEMONS argues that 6% of those with chronic respiratory disease have died from COVID-19. Mot. at 4-5. It is important to note that this is a case fatality rate, not an infection fatality rate, and it appears to be based on data from cases in China. The case fatality rate – especially in the midst of an epidemic – may be much higher than the infection fatality rate (the number of people who die compared to the total number infected) because of the lack of testing. See, e.g., Amy Harmon, "Why Don't We Know the True Death Rate for Covid-19," New York Times (Apr. 17, 2020), https://www.nytimes.com/ 2020/04/17/us/coronavirus-death-rate.html (last visited Apr. 24, 2020).

[3] As discussed below, LEMONS' own behavior suggests that his condition is not serious.

regarding possible complications caused by the COVID-19 virus, such speculation concerning possible future conditions does not constitute a 'compelling reason' for temporary release."); United States v Lake, 2020 WL 1852435 (D. Co. April 13, 2020) (asthma). See also United States v. Gumora, 2020 WL 1862361 (S.D.N.Y. April 14, 2020) (denying pretrial release for inmate who had asthma, HIV, high blood pressure, and various heart conditions); United States v. Irizzary, 2020 WL 1705424 (S.D.N.Y. April 8, 2020) (asthma); United States v. Smith, 2020 WL 1864587 (D. MD. April 14, 2020) (asthma).

The Court cannot guaranty that LEMONS will not contract COVID-19, whether he is in or out of custody. COVID-19 is present in every community in the Bay Area. To date, there have been at least 7,029 cases and 240 deaths in the Bay Area. See https://abc7news.com/health/coronavirus-updated-number-of-covid-19-cases-deaths-in-bay-area/ 6008027/ (last visited Apr. 23, 2020). Indeed, a preliminary study from Stanford researchers suggests that the number of people infected with COVID-19 in Santa Clara County could be 50-85 times higher than the number reported to the county's public health department. See https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v1 (last visited Apr. 23, 2020).[4] Releasing LEMONS from custody will not move him from a place where he faces risk of illness to a place where he does not. But it will definitely put the community at risk, including the pre-trial services officer(s) who must conduct a home investigation and set up any monitoring equipment the Court orders. See, e.g., United States v. Martin, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020).

LEMONS complains that he cannot practice effective social distancing in jail, but would be able to self-quarantine at home. Mot. at 5-6. There are many problems with this contention. First, it's a false choice. Though it is true that LEMONS cannot self-isolate while in custody, the CDC does not recommend self-isolation even for asthma sufferers who are not in custody. The CDC recommends social distancing and frequent hand-washing. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited Apr. 24, 2020). The jail has implemented numerous measures to effectuate a form of social distancing both within the jail and between the jail and the outside world, all with the goal of controlling the spread of the illness in the jail. The Sheriff decreased

---

[4] Of course, this could also mean that more people in the jail have been exposed than the numbers indicate. But the necessary corollary to that possibility is that many more people experience only mild symptoms or are asymptomatic than previously believed, and this in turn decreases the disease's infection fatality rate.

1  the jail population by 32.8% between March 1, 2020 and the present.  The jail is designed to hold about
2  4,000 inmates, see https://www.alamedacountysheriff.org/dc_srj.php, but currently holds only 1,745, see
3  https://www.alamedacountysheriff.org/admin_covid19.php (last updated Apr. 23, 2020).  This decreases
4  crowding in the jail and assists in creating more space between individuals.  The Sheriff requested that
5  local police agencies cite and release all but violent offenders, and this has "greatly reduced" the
6  numbers of bookings.  Id.  This not only helps keep the jail's population down, it also limits the number
7  of people coming into the jail who might bring the virus in with them.  And the jail suspended in person
8  family and legal visits.  Id.  These measures also help prevent the virus from entering the jail.

9      Further, the inmates live in separate housing units.  The jail quarantines an entire unit when one
10 inmate in a unit tests positive, and implements extra controls around movements into and out of
11 quarantined units to prevent the spread of the illness from one unit to the next.  Though it may be harder
12 for inmates within a housing unit to maintain social distance from each other, the jail's outbreak control
13 measures help maintain social distancing between housing units.  This situation is not dissimilar from a
14 family sheltering in place (or the new practice, called "quaranteaming," in which two or more families
15 shelter in place together): its members have lots of contact with each other, but limited contact with
16 other groups and that's how they stay safe.

17     The jail also has taken steps to provide some distancing between members of a single housing
18 unit.  It has educated the inmates about distancing, distributed masks for all inmates and staff members
19 to wear, enhanced its cleaning schedule, and given the inmates extra soap to facilitate hand-washing and
20 general cleanliness.  The jail has also screens all staff members before they begin work each day.

21     The measures Santa Rita has implemented are exactly the measures the CDC recommends for
22 incarcerated or detained persons.  See https://www.cdc.gov/coronavirus/ 2019-ncov/community/
23 correction-detention/guidance-correctional-detention.html#management (last visited Apr. 23, 2020).
24 The Sheriff is aware of that guidance and has been implementing it to the extent practicable in the Santa
25 Rita jail, including many of the measures described above.  Indeed, the jail's COVID-19 information
26 page has a link to the document.  See https://www.alamedacountysheriff.org/ admin_covid19.php (last
27 visited Apr. 23, 2020).  Thus, it is simply incorrect to argue, as LEMONS does repeatedly, see, e.g.,
28

Mot. at 5-6, that the conditions at Santa Rita are contrary to CDC guidance.[5]

LEMONS' unsupported claims that "COVID-19 has spread throughout the Santa Rita facility," and his breathless references to the number of cases in an unspecified number of Chinese prisons are unhelpful. There is no way to know how widespread the virus is inside or outside the jail. But only between 10 and 12 housing units have been under quarantine at any given time, and as of April 23, 2020, the total number of infections had been flat for two days (at 33) and the number of active cases had decreased from 15 to 8. Only 8 housing units remained in quarantine. It appears that the jail's infection control measures are working. If they weren't, we should expect to see the number of cases doubling every two to three days, and that has not happened. To the contrary, the number of cases has remained relatively low and, as of this filing, appears to be declining. There is no indication that Chinese authorities implemented the same infection control measures Santa Rita has implemented. Such comparisons are inapt, to say the least.

Second, it is impossible to determine the relative risks that LEMONS will contract COVID-19 in custody versus out of custody. Even if he were to live with his mother, as he requests, she would have to leave home to get groceries and possibly to work. More importantly, LEMONS has demonstrated that he does not adhere to the Court's instructions – despite professing his motivation to follow public health guidelines relating to social distancing, there is no reason to believe he would, in fact, follow those rules either. To the contrary, a person with asthma is strongly advised not to smoke because smoking irritates the lungs and airways and can cause asthma flare-ups. See, e.g., https://kidshealth.org/en/teens/smoking-asthma.html (last visited Apr. 24, 2020). Yet LEMONS was a frequent marijuana smoker and delighted in posting pictures on his Instagram page of himself surrounded by clouds of smoke. See Appendix.[6] Whatever the severity of his asthma – mild, moderate, or severe – smoking was contrary to his own best interests. He did it anyway.

Finally, LEMONS does not contend that he has COVID-19, or that Santa Rita Jail has denied

---

[5] Rather than address the CDC's guidance for in-custody populations, which Santa Rita appears to be following to the extent practicable, LEMONS relies on CDC guidance for out-of-custody populations in an effort to create the impression that the jail is not complying.

[6] Though the pictures themselves are not dated, the warrant only sought posts in the year between August 1, 2018 and late-August, 2019, when the warrant was signed. Consistent with this, LEMONS appears in the photos to be about the same age as he was when agents arrested him.

him adequate medical care for any health condition that he has, or that the jail would be unable to provide adequate medical care if he should contract the illness. Cf. United States v. Kidder, 869 F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on Eighth Amendment claim regarding avoiding prison due to medical condition, defendant "must show that no constitutionally acceptable treatment can be provided while he is imprisoned"). To the contrary, the jail's record so far suggests that it can. Of 33 inmates who have tested positive while in custody, 24 already have recovered and none have died. See https://www.alamedacountysheriff.org/ admin_covid19.php (last updated Apr. 22, 2020).[7]

There is every reason to believe that, if LEMONS did contract COVID-19, the jail would be able to provide him adequate treatment – either on-site if his case is mild, or in a community hospital if his case becomes more serious. According to the CDC, most cases are mild. See https://www.cdc.gov/ coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html ("Most people with COVID-19 have mild illness and can recover at home without medical care."). Pre-existing health conditions increase the risks of more serious illness, but do not assure it. Indeed, the CDC and county public health agencies advise those who contract COVID-19 to stay home and recover on their own, and only to seek medical help if they develop serious complications. See, e.g., id. (CDC) ("Stay home except to get medical care"); http://www.acphd.org/media/562537/sick-factsheet-english.pdf (Alameda County) ("Unless your doctor directs you to go obtain medical care, remain at home."). Thus, LEMONS' custodial status does not prevent him from following the course of treatment that public health authorities recommend. To the contrary, he would receive the equivalent of home care in jail unless and until he required a higher level of care – in that case, he would receive it at a hospital – quite possibly the same hospital.

### D. The Temporary Suspension of Contact Visits Does Not Hinder LEMONS' Ability to Prepare his Defense.

LEMONS also argues that he has a right to contact visits and that "this is near impossible under the present circumstances." Mot. at 7. This, he says, unlawfully burdens his rights to due process and counsel. Id. LEMONS has constitutional rights to assistance of counsel and meaningful access to the courts. United States v. Wilson, 690 F.2d 1267, 1271 (9th Cir. 1982). "While prisoners have a general

---

[7] According to the jail's COVID-19 information page, one inmate was release while positive for the illness. There is no further data about that person's status.

right to consult with their legal counsel, that right is not absolute . . . ." McMaster v. Pung, 984 F.2d 948, 953 (8th Cir. 1993) (finding that a ban on contact visits with one of defendant's attorneys, and limitation to "telephonic contact and consultation through the mails" did not violate his right to counsel). A defendant's access to his or her attorney may also be burdened by regulation or practice of his penal institution, if justified by legitimate interests of penal administration. Johnson-El v. Schoemehl, 878 F.2d 1043, 1052 (8th Cir. 1989).

All criminal defendants in custody face some limitations on their meetings with counsel, if only because visiting hours are not unlimited. Out-of-custody defendants face similar limitations because defense attorneys have multiple clients, court hearings, and other professional and personal engagements. LEMONS has not identified any conditions that make his confinement a particular obstacle to preparing his defense. His attorney may visit him in custody in a glass-partitioned room. He would have no greater access if he were out of custody – the shelter-in-place orders and need to maintain social distance would preclude him from getting any closer than six feet. It is not clear that shouting across a conference room provides any greater access than a face-to-face meeting in a glass-partitioned room.

Moreover, the current court closures and shelter-in-place orders have effectively stalled the case, including resolutions and trial setting. It is worth noting that, prior to the shelter-in-place order, the government believed it had reached a resolution with LEMONS. If that is true, then there is little additional preparation for him to do. If it is not true, then this short delay does not prejudice him. There is, as yet, no trial date set. And, LEMONS so far has agreed to time exclusions exceeding one year. Thus, he has demonstrated his willingness to delay trial in his case for much longer than the current epidemic threatens. He cannot now claim that this short, additional delay prejudices him.

**E.   LEMONS Has Demonstrated That He Is Not Amenable to Supervision.**

LEMONS was out of custody for about five months, with strict conditions related to his movement, activities and communications. As the Court found, see Dkt 207, and as he admits, see Mot. at 8, he willfully violated those conditions. He committed new crimes (he sold drugs), changed his Instagram account name to conceal his continued (and prohibited) access to the internet and maintained communications with several of his co-defendants (which was also prohibited). He also discussed with them the ways he was evading Pre-Trial's drug testing program to hide his continued drug use. The

Court found his violations and his betrayal of the Court's trust so significant that the Court remanded him and forfeited his $75,000 bond.

There is no reason to think LEMONS would behave any differently if the Court released him a second time. He may claim that this time is different, that this time, he has extra motivation to follow the rules. But he has demonstrated repeatedly that he does not abide Court orders or medical advice. He was on misdemeanor probation for a weapons offense in Alameda County when he was arrested for carrying a stolen, loaded firearm. Following that arrest, and with a felony firearms case pending in Alameda Superior Court, he arranged the sales of firearms to an informant on four different occasions. He continued to offer firearms to the informant and others even after his state case concluded in a felony conviction and an additional grant of probation. Indeed, in messages in December 2018, LEMONS made clear that he was seeking and selling guns. The day after police conducted an enforcement operation on Makin Road and seized guns, LEMONS messaged co-defendant Joe Frank and said "Leme kno what u got rn I'll grab whatver u got I need sum I just got all my shit took". Frank responded, "All I really got is that glock 19 and a sig p226". LEMONS asked "[W]hat u want for that 19"? Two weeks later, LEMONS was back in business: he put up a post that said, "Who want a glock 23 with a stick" meaning that he had a Glock 23 with an extended magazine for sale. A contact called "rollagang6" asked, "How much"? LEMONS responded, "950". When rollagang6 balked, LEMONS said, "I kno it up there it's green n tan I got 30-22 stick stock n it's a switch on there that's why," meaning he also had a Glock 30 with a 22-round magazine and a full-auto switch on it. Rollagang6 asked, "So it's fully?" LEMONS responded, "Yeah it's fully". He also offered, "I got glock 30 with stic same price lil 45 like the 27 no switchtho," meaning that he had another Glock 30 (which is a compact .45 caliber), also with an extended magazine, but without a full-auto switch. In January, he offered, "Who want my glock 21 stock n 30" meaning that he had a Glock 21 with a 30-round magazine for sale. Being a convicted felon on probation thus did not deter LEMONS in the slightest from continuing to traffic firearms. LEMONS helped ensure the proliferation of black market guns into poor neighborhoods in Oakland. Those guns don't go to people who can buy guns lawfully. They are crime guns and they're sold to criminals to facilitate further violence. This shows LEMONS' lack of concern for his community and the violence and trauma those guns cause. The person who seeks to profit from that misery cannot be trusted to act

in the community's best interest when it comes to acting responsibly during a pandemic.

LEMONS also sustained two probation violations following his felony firearms conviction, and received 6 months and 2 months in jail, respectively, for those violations. And, as the bail study noted, police have arrested LEMONS multiple times for domestic violence, and he was subject to a restraining order at the time he was arrested on the federal warrant. Indeed, the police found him when he violated that restraining order an additional time and the protected person called the police. He fled and attempted to conceal himself, but was apprehended.

The Court cannot trust that LEMONS would abide any restrictions the Court imposed if it were to release him again. Indeed, his inability to proffer a co-signor or surety indicates that those who know him best are equally skeptical of his ability to conform to the Court's orders. Indeed, as he has shown, being on lockdown at home is no impediment to continued criminal activity. He can carry on his illegal drug and gun business so long as he has access to a smartphone. He was able to get such a device before, almost immediately after he was released. There is every reason to believe he will do so again if the Court releases him again.

LEMONS is not amenable to supervision and this makes him a continuing danger to the community if he is released. He should be detained.

## IV.  CONCLUSION

For the foregoing reasons, the government asks that the Court deny LEMONS' request.

DATED: April 24, 2020                                            Respectfully submitted,

DAVID L. ANDERSON
United States Attorney

_____/s/_____
FRANK J. RIEBLI
ERIN A. CORNELL
Assistant United States Attorney

**APPENDIX**









GOV'T OPP'N TO DEFT'S MOT. FOR RELEASE FROM CUSTODY     15








